5 days, 1, 3 days, 3, 3, 5. People v. Kofron. Counsel. Your Honors. Counsel, may it please the Court. My name is Kelly Stacey and I represent the people of the state of Illinois. In this case, the defendant was charged with multiple counts involving methamphetamine. A key issue in the case concerns probable cause for the defendant's arrest. He successfully convinced the trial court that meth trash he threw out of a back door, although in plain view, was only found because police breached the curtilage of a home where he was staying. The defendant claims that this meth trash, which consisted of a can of Drano and a Sudafed package, an empty package, were found hours apart. Even though they were right in the same area, they were found hours apart. Actually, they were found at the same time in the same location. In this case, the defense elected to write a statement of facts in their answer brief. This statement of facts shows the error in this timeline concerning when the Drano and Sudafed were found. At page 4 of the defendant's brief, he indicates that Deputy Peters testified he knocked on the front door at Tiffany Polson's home at 4.07 p.m. Were there anybody in the back? At some point, there were officers in the back. At what point they went to the back? Yes. Two came to the front door and then four in the back. That's my understanding, Your Honor. How could they go to the back door? How could they go to the back door? Are you walking there or what? I don't believe the record establishes when officers went to the back door. At the same time, two guys went to the front door and knocked, right? Yes. Officer Nord and Deputy Peters knocked at the front door. I would submit to the court, though, even if those four officers went to the back door while two were at the front door, in the People v. Redmond case, it's a four-district case. They knocked and talked to the guys in the front. That's right. It's a knock and talk. I apologize, Your Honor. No, but the four guys went to the back, too, right? Four officers were at the back, according to the testimony presented at the suppression hearing. Okay. They went to the back door simultaneously, almost, with the two officers going to the front door. Is that not correct? I don't believe the record is entirely clear on when that occurred. We do know that by the time the defendant went to the back door, officers were back there. So, actually, they walked a little faster. They could have. Yeah, I understand that. Did they ride in different automobiles? I believe they did because this case, if Your Honors will recall, started with a phone call from the defendant's roommate, Robert Haney, saying, I found some stuff on the back part of my property under this building that I believe is— Like a warrant to do that? They didn't need a warrant to do that because it was a tip from the defendant's roommate who would have had authority to turn over anything at that location. This was on Judith Street. That's what started the whole investigation was this—more than an anonymous tip, it's an identified individual. It's a specifically referenced piece of evidence. It's a shake-and-bake meth lab. So, from there, officers certainly had reasonable suspicion, which continued to mount. Mr. Haney told— That was a knock-and-talk. Yes, for the knock-and-talk. The two confronts and four went to the back at the same time. Well— Don't you think? I think it's not entirely clear that that occurred, but I would submit to the court even if it did. Under the Redmond case that I referenced before, the Fourth History case, officers are allowed to go to the back door if there's a legitimate reason to do so. To do what? To make sure the defendant doesn't slip out the back door. So, they arrived at this Fifth Street— Did the knock-and-talk occur? The knock-and-talk occurred at the front door. The defendant opened the door and said, Because of these dogs barking in here, I can't come out the front door. So, officers would have reasonably believed he invited them to the back door. Even if they didn't, because of— Mr. Robert Haney told them, Hey, the defendant isn't here, but he's been standing with his mom over here on Plum Street. They get to the Plum Street location, and lo and behold, the defendant's truck is right across the road on Fifth Street. They're aware of the defendant's truck because he's been involved in multiple calls that they've responded to. Based on the defendant telling officers, I've got to reach out back, that's a reasonable reason to go out the back door. On their way to the back, officers observed, in plain view, a Sudafed package and a bottle of drain oil. Was this an empty package? It was an empty package. It was a 96-caliber. Yes, those blister-level packs. Yes. Again, noting the discrepancy in this timeline, when the defendant noticed that officers had discovered the meth trash back there, his response was, None of it is mine. I'll stay across the street. I'm here visiting. If it had only been a can of drain oil, would he really have said, None of it is mine? Wouldn't he have just said, That drain oil's not mine, or that's not mine? None of it is mine is a very good indication it was more than one item that was located at that time. So based on the defendant's own account, those items were found at the same time. They were discovered at 4.07 p.m. just prior to the defendant's arrest. If the Sudafed had been found later, the defendant would have already been at the police station, and he wouldn't have been able to say, Hey, none of that is mine. Another big problem in the case is, defense counsel at the trial court level argued there was a second bottle of shake-and-bake meth found in a location at the back of the Polson property. The problem is, the defense only cites to the attorney's argument, and the reason is, it's nowhere else in the record. And defense counsel's argument is not evidence in the case, and it's actually improper to argue something that's not in evidence. So the court really was misled here. They were also led down a path to believe there was still this cartilage distinction when it comes to trash that's thrown out. This wasn't an issue of police peering in and finding these things, because even incident to arrest when they seized this meth trash, when they searched the premises after that, and, again, consent is really a red herring here. It's not an issue because nothing was found after the search. When they looked in the garbage can and searched the home, they didn't find anything else. Did the defendant own the property there? He did not. Ms. Polson owned the property, and during her interview at the police station, she had apparently called her boyfriend. She was arrested herself there, right? Yes. For doing what? Well, that's a good question, and it's also another red herring because she's not a defendant in this case, A. B, her entire interrogation is on video in the record here, and this court can certainly look at that. So the issue of whether or not she gave consent, her testimony was that her boyfriend, Scott, whose name was on the mortgage instrument, gave officers permission to search. Even if you find that search was unconsented to, there were no fruits of that search. You're claiming no search. I'm claiming no search. Okay, now, was that packet, that empty blister pack, was that viewed from off the property, or was it not until they were next to the garbage can? I believe it was viewed from what I can gather in the record, it was viewed from the deck at the back door of the property. It sounded like the garbage can was between the deck and a garage. Okay, now, so where was this packet? The packet was lying next to, very close to the garbage can. The drain hole was sitting on top of the garbage can. I understand where the drain hole was. That's clear, but I was trying to find out where the packet was. So the packet was like 120 degrees to the side that they could view, where the officers entered. Well, Deputy Peters testified that the items were found at the same time and that the defendant said, So they saw it from where? They would have seen it from the deck. When they saw the drain hole pan, I believe that triggered them to say, oh, wow, they looked down and there was an empty suit of that packet. So none of this was concealed. None of this was hidden from the public. It was sitting right out there where anyone could have seen it, and there's no expectation of privacy here. That was not established at all. You could do that? If you're in an area where you have a legal right to be, anything you observe is plain to you, and you do not need a warrant for that. You do not. The owners allowed them to go, the poor people there, right? Yes. I believe in this case because of the fact. The lady there told the poor guys to go in the back. No, she did not tell them that. Ms. Polson's arrest, there was a serious problem. Thank you. We have the record. We have the record. Thank you. Thank you. May it please the Court. My name is Amanda Horner from the Austin State Appellate Defender, and I'm representing Mr. Kilbrine. Your Honors, we request at this time that this Court affirm Judge Haida's ruling to suppress the Drano, the pseudoephedrine packet, and the shake and bake that was found in the shed behind the property, as well as any statements that was made as a result of this illegal arrest. Now, there's a couple of things that I would like to clear up the State said before I start the rest of my argument. First, the record makes clear that six officers arrived simultaneously, and that is the undisputed testimony from the only officer who testified on behalf of the State. They arrived simultaneously. Two went to the front door. Four went to the back door at the same time. There's one with six people. Six people. There were six officers. Only one actually came to the hearing to testify. Now, the rest of them were subpoenaed, and the State saw not one, but two continuances because none of the officers ever showed up. And the one that testified, is that Officer Peters? It is Officer Peters. Did he go to the back? He didn't go to the back. He wasn't at the front. Officer Peters said that he didn't see Ms. Poulsen be arrested. He didn't see Mr. Kohlfein arrested. He also didn't see any of the evidence being collected. So, I'm not really sure what Officer Peters saw. And he was the only police officer. Was he one of the six? It's unclear from the record. What we know, Officer Peters testified that two officers went to the front door, four officers went to the back door. But then when he was asked specifically, did you see them forcibly remove Ms. Poulsen from her home? Because, of course, we know, and again, it's undisputed, that while she said, I want an attorney, you can't consent to search my home, they physically dragged her through the front door. And when he was asked, which officers would have done this? He didn't see it. He also didn't see Mr. Kohlfein being tackled to the ground. Now, the State is now also claiming that the Drano and the Pseudo Ephedrine were found at different times. But again, it was Officer Peters. The only testimony that was given at this hearing, it's undisputed, that the State police log that was presented showed that the Drano was found at the same time as the arrest, so roughly within a few minutes of 4.07 p.m., right, when the knocking talk commenced. Now, the record showed that it was two hours later when the police officers found the Pseudo Ephedrine blister packs. That's what the State police log shows, and there's nothing to dispute that. Officer Peters didn't collect the evidence himself, and the State didn't present any witnesses that actually did collect the evidence. So all we have to go on is what the State police log said, and again, that's the undisputed testimony of the only witness the State presented at trial or at the hearing, Your Honors. So Peters was a State policeman? I do not remember exactly which agency he worked for. The Cahokia police were involved as well as the State police, because what happened was they were called by Mr. Haney, who again was also not presented by the State at either of these hearings. Mr. Haney called and said, look, I have found something under the skirting of a building in the house that I rent. I think it belongs to Mr. Kovron. They go, and they believe it was a shaken bag. So they called the meth response team, which I believe includes the State police, and they then go, at least six officers, to Mr. Kovron and Ms. Polzin's residence. Now, how many of those officers were State police, I can't tell you for sure, but we know there were at least six, and local police were involved as well. Judge Hines' findings should only be disturbed if they're against the manifest way of evidence, and here Judge Hines specifically found that police didn't have a search warrant and they didn't have an arrest warrant when they showed up. In fact, they showed up for a consensual encounter, a consensual encounter that led to them forcibly removing Ms. Polzin from her home, even as she was asserting that she did not want to leave and that they could not search, and it resulted in them tackling, and again, the undisputed facts, them tackling Mr. Kovron to the ground and then arresting him. Judge Hines noted that... Was that in the backyard? I'm sorry? Was it in the backyard? Yes. From what we could tell, Ms. Polzin was being pulled out of the front of her home at the same time that Mr. Kovron was being tackled in the backyard. He actually noted that he could hear screaming from the front yard while he was in the backyard with police officers. So he wasn't on the deck? Well, he exited the house, and he said almost immediately after exiting the house, he was tackled. There was some exchange there. What's your name? It's unclear. He exited the back door, and then very soon after, he was tackled and arrested, and simultaneously, Ms. Polzin was also dragged from her home. Incidentally, as part of this arrest, child protective services were also called because Ms. Polzin had a 10-year-old child at home, and animal control was also called, and all of the animals were taken out of the home. Now, the trial court found, specifically said, that he found the fact that the police ignored Ms. Polzin's request for an attorney and her refusal to give consent offensive, and he said that in all of his years of law enforcement, he didn't think he'd ever seen conduct that exceeded the conduct that took place here. Now, the state has tried to claim that this was not a search, and certainly, Judge Hayda specifically found, and again, these are factual findings that should only be disturbed if they're against the manifest way of the evidence, that the only way the drain hole could have been found was once police breached the cartilage of the property, and the state's own witness testified that the drain hole was in the private area of the home, and again, there was also testimony at the hearing about how the streets connected and what you could see from these streets, and Judge Hayda found from this testimony, as well as from the state's own witness, that this was in the private area of the home. Thus, it was a search. Was the can empty, or did it have some Drano in it? It's not clear. It's not even clear from the record whether this Drano, you know, there was some testimony that this Drano could have even been used to make meth, that it was not the right type of Drano, but in any event, it was sitting on top of the trash can, but up next to the house, so up next to the house and the deck, and again, it's hard to tell the exact positions from, you know, a cold record, but after hearing the testimony, Judge Hayda found that it was in the private area, and it could have only been seen once the cartilage had been breached. I'm not sure how this is not a search. The pseudoephedrine packets were found two hours later, and again, if it was in plain view, why did it take police two hours of actively searching this property to find the pseudoephedrine packets? That's not plain view, and then the state also disputes that there was some other evidence that was taken from the shed, but the actual motion by Mr. Colfron asked that all evidence that was found at this resident be suppressed, and the trial court, after the conclusion of this, specifically asked, what is it that was found, and what do you want suppressed, and she listed out, counsel listed out, the Drano, the pseudoephedrine packets, and this other material that was found in the shed outside the house. Now, the state's trying to claim that that is improper, but the state didn't present any witnesses regarding what was actually found. The state didn't present any police officers that would testify about the search or any other materials, so the only thing the trial court and counsel could have went on, because Mr. Colfron and Ms. Polzin were not present for the search itself, was what the state police included in their police law. Now, Mr. Colfron was living at least temporarily in this home, and so he had an expectation of privacy, and therefore, the only way the police could have breached the cartilage of his home, searched the private areas behind his house, much less a shed behind the home, is either with consent or a search warrant, and it's undisputed there was not a search warrant, which means the only way this search could have taken place was if there was consent. Now, Ms. Polzin gave consent, but this consent was only given after she was illegally arrested, after she saw animal control come and take her animals, after DCFS, or Child Protective Services, was called to take her child, and after she was told if she, and again, this is undisputed, if she requested an attorney, they could hold her for at least 72 hours under the Patriot Act, and she told Judge Hayda that at the point when she signed documents that she felt overwhelmed at the possibility of losing everything that mattered to her, and Judge Hayda found that that was not a voluntary consent. Now, the state has also tried to point out that Scott, who was a co-mortgagee on the home, and a third party to this matter, gave consent, but there's nothing in the record that says he gave consent. What we have in the record is the police saying, oh, we've got his consent, here, I want you to sign this for Ms. Polzin, and the state below never, ever asserted at the hearing in front of Judge Hayda that they had the consent of anyone but Ms. Polzin, so the state can't now assert on appeal that there was consent from some other third party when that was never presented at the hearing below. Your Honors, Judge Hayda listened to the witnesses, the undisputed facts of this case, and found that police officers breach the privilege. Thank you. Rebuttal? Thank you, Your Honor. Your Honor, I would note that the case on appeal here is Peoplehood State of Illinois versus David Coffran. Tiffany Polzin is not a defendant in this case. Whether or not her arrest was a proper arrest is not an issue here. The issue of consent, whether or not she gave consent. Counsel is wrong that there's no evidence in the record that consent was given by Scott. That came in through Tiffany Polzin's testimony. She said she called her boyfriend during the interview, and he gave officers permission to search. Again, that's not a material factor here because there was no search in 20 years. My question is, who is Officer Peters? Officer Peters is a deputy with the Cahokia Police Department. He testified at hearing. He's the only one that testified? He's the only one that testified. I would note this is a motion to suppress. Right. It's the defendant's burden to prove that, not the state. The state was not required to call all six officers. The trial court was wrong to have said they needed to call all of those officers, and even checking into the subpoenas. Was it true that Peters was not even there, or was he there? Peters was there. He knocked on the front door, and in addition at the hearing. So he never saw the Drano cans in the back? He did not. He never saw the Drano cans in the back. And any information obtained by all of the officers can be testified to by one. That's the rule in the law on motion to suppress. This case hinges on police officers' suspicion of criminal activity. They were tipped off from defendant's roommate. He's been making meth. It's Outback. This is a dangerous product. The stateside People v. Schroeder, it's a 2012 3rd District case, and that case says because this case hinges on police officers' suspicion of criminal wrongdoing by the defendant, the facts supporting their suspicion should be considered from the perspective of reasonable officers at the time the situation confronted them. Would reasonable officers, when this defendant is alleged to have committed three Class X felonies, just stay at the front door, or would they send anybody to the back door to see if he might try to slip out? That's a legitimate reason to go there. An additional legitimate reason to go there is because the defendant said, I can't go out the front door. I'm going to go out the back door. Is that okay or what? If this doesn't establish probable cause, honestly, I don't know what does. Couldn't he get it worn? They could. They could have gotten it worn. Here's the problem if they've gotten it worn. This wasn't a case of they didn't go find the meth right away. They went there, found the meth, and then the guy who showed it to them and said, hey, defendant's been making this, said, I know where he is. Why don't you drive over there? They drive over there. At that location, they see his truck. There was no time or opportunity to get it worn because evidence could have been destroyed by that time. Do they have any record as to the person that said he found the meth, does he have any record as to telling the police something that's correct or any kind of reputation in the community? I think what verifies the tip, and again, verification is really only an issue when there's an anonymous tip. That's not what we have here. We have a specific individual who has knowledge of what's on that property, and the defendant was the one who put it there. Are we talking about some other property than this house? The only shaken bank meth found was at Robert Haney and defendant's house. Nothing was found in the shed on opposing residence, and trial counsel's suggestion to the court there was is improper and it's not supported by the record. What I'm trying to figure out is, where was this bottle that was allegedly containing meth found? Was it on the house they were in where they knocked into the door? It was not at Tiffany Poulsen's house. It was some other location. It was at Robert Haney, and the defendant had three different homes. He lived with Robert Haney, he lived with his mom, and he lived with Tiffany Poulsen allegedly. He didn't own any of those homes. He didn't own any of these. When you try to pin contempt, it's like nailing jello to the wall. He's got a reason for everything. None of his testimony makes sense. He backtracks everything. The issue in the case is, on a Fourth Amendment analysis, a defendant has to establish a reasonable expectation of privacy, which includes an actual subjective expectation, and it also includes, is this an expectation society is willing to recognize? I submit under the facts of this case, it is not. Based on 47 years of case law since Cats v. United States, that's been the law. Thank you, Counsel.